UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN SCHOPPMAN,

    Plaintiff,

v.                                                 Case No. 8:11-cv-216-T-30TGW

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,

    Defendant.
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant University of South Florida Board of Trustees' Motion for Summary Judgment (Dkt. 16) and Plaintiff John Schoppman's Response in opposition (Dkt. 28). The Court, having considered the motion, response, record evidence, and being otherwise advised of the premises, concludes that the motion should be granted and judgment entered, as a matter of law, in favor of Defendant.

## INTRODUCTION

In the instant action, Plaintiff, a former employee of the University of South Florida ("USF"), alleges that he was retaliated against under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (Count I) and the Florida Civil Rights Act ("FCRA") (Count II). Specifically, Plaintiff alleges that Dr. Gretchen Koehler subjected him to retaliatory conduct and eventually terminated him in April 2008, after Plaintiff participated in two investigations of alleged discrimination and retaliation claimed by <u>another</u> USF employee.

Defendant moves for summary judgment on Plaintiff's retaliation claims. The Court concludes, as discussed below, that there is no genuine dispute as to any material fact with respect to a *prima facie* case of retaliation because Plaintiff cannot show that there was a causal relation between his non-reappointment/termination and his protected activities. Also, even if Plaintiff could establish a *prima facie* case of retaliation, Plaintiff cannot show that Defendant's legitimate non-retaliatory rationale for Plaintiff's non-reappointment was pretextual. Accordingly, Defendant is entitled to judgment as a matter of law.

## **BACKGROUND**

Plaintiff is a former employee of the University of South Florida ("USF").[1] Plaintiff held various jobs at USF, starting in October 1987.

In July 2005, Plaintiff was reassigned to the College of Medicine ("COM"), Office of Admissions. At that time, Robert Larkin was the Director of Admissions and Plaintiff's supervisor.

In April 2007, as part of a University-wide reclassification project, Plaintiff was reclassified as an Admissions Recruiter/Advisor. As an Admissions Recruiter/Advisor, Plaintiff continued performing the same job duties of maintaining the website for medical school applicants, scanning documents to be posted on the website, and scheduling applicant interviews. Plaintiff also advised applicants on the status of their files, i.e., what they were

---

[1] Defendant is the Board of Trustees of the University of South Florida, a member institution of the State University System of Florida, and the legal entity with the authority to sue and be sued in the name of the University of South Florida.

missing, and what they needed to complete. Plaintiff's job duties did not extend to advising current medical students.

In March 2007, Dr. Paul Wallach, Vice Dean of Educational Affairs, began implementing a re-organization of several departments in the COM. As part of this reorganization, Dr. Gretchen Koehler was appointed as Assistant Dean of Educational Affairs, having administrative oversight over the Office of Admissions and the Office of Student Diversity and Enrichment. As Assistant Dean, Koehler became the direct supervisor of Larkin. Koehler reported to Wallach until he resigned in April 2007, at which time she began to report to Dr. Bryan Bognar, who became the Interim Vice Dean of Educational Affairs.

Shortly after Koehler became Assistant Dean of Educational Affairs, Plaintiff met with Koehler to discuss an incident between Bryant Fayson, the Assistant Director of Admissions, and Larkin. Plaintiff told Koehler that Larkin had made an off color joke and inappropriate gesture towards Fayson in January 2007. This was the first time Koehler had heard about the incident. Koehler informed Nancy Wisgerhof, who was the Human Resources Director of USF Health at that time. Wisgerhof then spoke with Fayson, Larkin, and Dr. Steven Specter, Larkin's supervisor at the time of the incident, and reported what she learned to Bill Havens, the Compliance Coordinator at USF's Office of Diversity and Equal Opportunity ("DEO").

On March 30, 2007, Plaintiff was interviewed as part of the DEO's investigation of Fayson's complaint against Larkin. During the interview, Plaintiff told the investigator that

he had witnessed Larkin's joke and that it was not the only incident of distasteful humor by Larkin. As evidenced by the content of the DEO's Final Investigative Report issued on May 31, 2007, Plaintiff did not say anything negative in his interview about Koehler, who had recently begun her oversight of the Office of Admissions earlier that month.

After Koehler took over as Assistant Dean of Educational Affairs, Bognar requested that she review the operations of the Office of Admissions and make the necessary changes for its improvement. In July 2007, Larkin resigned and Koehler became the Interim Director of Admissions. In that capacity, Koehler continued her review and restructuring of the Admissions Office. Koehler instituted some changes, such as using a new "in and out" board to be used to keep track of employees and their availability on a day to day basis. She also instituted a policy where employees who were going to be late or absent on a particular day had to contact their supervisor by phone or email and give a reason for the delay/absence and their arrival time.

According to Koehler, after taking over the role of Interim Director of Admissions, she started to develop concerns about Plaintiff's role in the office. Koehler was informed by Bognar that Plaintiff needed to refrain from advising students because Plaintiff had a history of providing improper advice to get around established protocol. According to Koehler, she also observed that Plaintiff was producing insufficient documentation of the advising sessions he was holding with prospective students.

The record reflects emails dated August 16, 2007, and October 31, 2007, discussing Plaintiff's performance of his job duties and Koehler's concern that he did not resolve issues the way she thought he should.

On November 1, 2007, Koehler received information from the business office that there were problems with Plaintiff not following the correct process for getting food invoices paid in a timely manner.

Around this same time, on October 29, 2007, after the Assistant Director of Admissions position was eliminated as part of Koehler's overall restructuring of the Admissions Office, Bognar and Koehler issued a letter of non-reappointment to Fayson.[2]

On November 16, 2007, Fayson filed a complaint against Koehler with the DEO, claiming that his non-reappointment was retaliatory and discriminatory. According to Koehler, she was not informed of who would be interviewed during the investigation of Fayson's complaint.

In January 2008, Koehler hired Leila Amiri as the Associate Director of Admissions in the Office of Admissions for USF's COM. Amiri started working on January 11, 2008, at which point she became Plaintiff's direct supervisor. Koehler was Amiri's direct supervisor.

The record reflects that on January 24, 2008, Koehler emailed Amiri her assessment of Plaintiff's performance to date. In the email, Koehler told Amiri that Plaintiff had "much room for improvement" and that she had not yet conducted a special evaluation of Plaintiff.

---

[2] A notice of non-reappointment may be issued at any time and need not be for cause.

(Koehler Aff. Tab 17). In the email, Koehler suggested that Amiri supervise Plaintiff for a month or so and then they could meet with Plaintiff to do a special evaluation.

According to Amiri, Koehler subsequently told her that Amiri should hold off on Plaintiff's evaluation until the completion of the Fayson complaint against Koehler. According to Amiri, one of the first things Koehler discussed with her after she started was that Koehler intended to terminate Plaintiff because he was not performing at the level that she expected and did not fit with the office.

The record reflects numerous emails between Amiri, Koehler, and Plaintiff during the period of time from late January 2008 to late March 2008 regarding issues with Plaintiff's performance. For example, on February 4, 2008, Koehler received an email from Specter, regarding a complaint he received from Heather Greenberg, an applicant to the medical school program. Greenberg had complained about Plaintiff being unprofessional in their discussion about the merits of her application. Specter advised Koehler: "I strongly encourage you to counsel Mr. Schoppman (Plaintiff) about his behavior or remove him from opportunities where he may again speak inappropriately to applicants or enrolled students." (Koehler Aff. Tab 19).

Amiri subsequently met with Wisgerhof to seek her guidance on how to address Plaintiff's performance issues.

On February 15, 2008, Specter notified Koehler that Plaintiff had inappropriately advised a current medical school student on how to circumvent the curriculum and get

around signing up for certain rotations. Koehler informed Amiri, who then replied, "Wow! I hate that he does that." (Koehler Aff. Tab 20).

On February 21, 2008, Plaintiff met with Koehler and Amiri regarding Specter's complaints. Plaintiff denied that he did anything inappropriate and stated that he felt his civil rights were being violated when he was not given the opportunity to address or respond to the allegations.

Subsequently, Amiri continued to send Plaintiff emails regarding his performance issues. According to Amiri, Koehler made her send Plaintiff emails outlining and documenting his performance issues and also required Amiri to always copy Koehler on the emails. According to Amiri, there was nothing untrue contained in the emails, but she thought that Koehler was being unfair in her treatment of Plaintiff. According to Amiri, the work environment was stressful during this time, which unfairly impacted Plaintiff's performance. According to Amiri, Koehler did not give Plaintiff a chance to improve his performance and Amiri felt that Koehler did not like Plaintiff. According to Amiri, Plaintiff did have performance issues and her emails to Plaintiff reflect that Plaintiff was not making a genuine effort to rectify concerns with his performance.

On March 19, 2008, Specter sent an email to the employees in the Admissions Office, including Plaintiff, requesting that they direct all information regarding residency selection and other career counseling to the Student Affairs Office. Specter said, "Even if advice is solicited from you I request that you refrain from participating in such advising." (Koehler Aff. Tab 25).

On March 22, 2008, Amiri sent Koehler an email stating that Plaintiff was undermining her and that she needed Koehler's help to "reel him in." (Koehler Aff. Tab 28).

Subsequently, Koehler received an email from Carolyn Nicolosi dated March 24, 2008, discussing that Plaintiff had inappropriately and poorly advised several current medical school students, including a fourth year student about his Rank Order List for residency selection. The email stated that the student took Plaintiff's advice and that the outcome could have been "ugly" if the student had not matched to his first choice program. (Koehler Aff. Tab 26). According to Plaintiff, he was not improperly advising students as Defendant alleges.

On March 25, 2008, Plaintiff was interviewed for the Fayson-Koehler DEO investigation.

Around the end of March 2008, Koehler concluded that Plaintiff did not have the skill set needed to effectively perform the job of the Admissions Recruiter/Advisor. According to Koehler, a different approach was needed and Plaintiff did not fit into the direction she was taking the Office of Admissions. With Bognar's approval, Koehler consulted with Wisgerhof about her options for removing Plaintiff from his position. Wisgerhof and Koehler agreed that non-reappointment was the most appropriate action to take because it would not negatively affect Plaintiff's ability to obtain other employment with USF. Wisgerhof then sought and obtained approval for Plaintiff's non-reappointment from her supervisor, Michael Stephens.

On or about March 27, 2008, Koehler began the process of preparing a Request for Non-Reappointment, wherein she recommended that Plaintiff not be reappointed to his position in the Office of Admissions. Koehler, Bognar, and Wisgerhof testified that they would have likely discussed Plaintiff's non-reappointment more than two days, and probably weeks, before Koehler drafted the Request for Non-Reappointment dated March 27, 2008, however, they could not testify as to the specific date except that it must have predated March 27, 2008.

According to Amiri, she was not involved in the actual decision to non-reappoint Plaintiff. However, Amiri disagreed with the decision and thought Plaintiff deserved more of a chance to improve his performance. According to Amiri, the only reason Koehler ever gave Amiri about Plaintiff's non-reappointment related to Plaintiff's performance.

The record reflects that on April 2, 2008, Koehler advised Wisgerhof that Bognar would be out of the office from April 7 to April 11, 2008, and she would be out of the office from April 9 to April 13, 2008, and suggested that the non-reappointment letter could be delivered to Plaintiff by Koehler and Bognar on April 16, 2008. The letter was signed by Joann Strobbe, the Chief Financial Officer and Associate Vice President of Finance, Administration and Technology, and dated April 8, 2008. Koehler then emailed Wisgerhof and again inquired if she and Bognar could deliver the non-reappointment letter to Plaintiff on April 16, 2008.

That same day, on April 8, 2008, Koehler received a copy of the Determination Letter and Final Investigative Report for DEO Complaint 2007-062, which Fayson had filed against

Koehler. The DEO issued a "No Cause" determination for his allegations against her. In the report, Plaintiff told the investigator that he had "never witnessed anything done by Koehler treating Fayson differently due to his race." (Koehler Aff. Tab 38). Plaintiff did say, however, that he "feels Koehler does have a problem with men." *Id.*

Consistent with Koehler's request that she and Bognar provide Plaintiff with the non-reappointment letter on April 16, 2008, Strobbe signed an identical non-reappointment letter dated April 16, 2008. The letter stated that Plaintiff's employment in the position of Admissions Recruiter/Advisor would end at close of business on October 16, 2008, and that the decision was based "on the determination that a different approach is needed for the College of Medicine Admissions Office." (Koehler Aff. Tab 38).

Subsequently, Plaintiff was relocated from the Admissions Office and placed under the supervision of Bognar until his last day of employment on October 16, 2008.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action

will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson,* 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

**I.    Legal Discussion - Retaliation Claim**

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008); *Butler v. Alabama Dep't of Transp.,* 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.").[3] Plaintiff's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

Importantly, the *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims relying on circumstantial evidence. *Brown v. Alabama Dept. Of Transp.,* 597 F.3d 1160, 1181 (11th Cir. 2010). Once a plaintiff has made a *prima facie* case of retaliation, "the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant is able to successfully rebut the presumption of retaliation, then the burden

---

[3]The same standard also applies to retaliation claims under the Florida Civil Rights Act. *Blizzard v. Appliance Direct, Inc.,* 16 So.3d 922, 926 (Fla. 5th DCA 2009).

shifts back to the plaintiff to show that the defendant's purported reasons are a mere pretext for retaliation. *Id.* at 1181-82.

The record is bereft of any direct evidence of retaliation. Under Eleventh Circuit precedent, "only the most blatant remarks, whose intent could mean nothing other than to retaliate on the basis of an impermissible factor constitute direct evidence of retaliation." *Masso v. Miami-Dade County*, 465 F. Supp. 2d 1260, 1264 (S.D. Fla. 2006) (quoting *Ward v. Univ. of Cent. Florida Bd. of Trustees*, 2006 WL 1119191, at *4 (M.D. Fla. April 26, 2006)).

Here, although Amiri testified that Koehler intended to terminate Plaintiff as early as January 2008, and stated that Koehler appeared to be picking on Plaintiff as set forth above, Amiri admitted that she had no personal knowledge as to whether Koehler's actions were related to any protective activity on the part of Plaintiff. Indeed, Amiri testified that she could point to no evidence that Koehler was retaliating against Plaintiff because he participated in Fayson's DEO complaints. And Amiri admitted that Koehler never told her that she wanted to hold off on evaluating Plaintiff until she saw what he said to the DEO investigator.[4] Finally, Amiri admitted that she was not involved in the actual decision to non-reappoint Plaintiff.

Therefore, Plaintiff must rely solely upon circumstantial evidence to prove his retaliation claim against Defendant.

---

[4] Notably, on this issue and on many of the arguments asserted by Plaintiff in his response in opposition, Plaintiff misstates the record or selects general statements to prove a point that is later discussed in the record, and often, corrected or restated in more detail.

## II. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation As a Matter of Law

### A. The March 30, 2007 Interview

Defendant assumes, for the sake of argument, that Plaintiff's March 30, 2007 interview in connection with Fayson's first DEO complaint against Larkin was protective activity. And Defendant assumes that the non-reappointment of Plaintiff was an adverse action. Defendant argues, however, that the record is bereft of any genuine issues of material fact with respect to any causal relationship between the March 30, 2007 interview and the non-reappointment. The Court agrees.

It is undisputed that Koehler, the person who made the initial recommendation not to reappoint Plaintiff to his position, was not the subject of Fayson's complaint about Larkin. Koehler was not accused of wrongdoing with respect to that complaint and Plaintiff's March 30, 2007 interview as part of that investigation occurred before Koehler took over supervision of Plaintiff in the Admissions Office, when she became Interim Director in July 2007.

Notably, Plaintiff did not say anything negative in his interview about Koehler. And Plaintiff testified during his deposition that he is not claiming in this case that he was retaliated against because he was a witness in the DEO investigation of Larkin's conduct toward Fayson.

Finally, throughout his response in opposition, Plaintiff spends a lot of time focusing on Amiri's testimony about Koehler's unfair treatment of Plaintiff, such as Koehler's statement to Amiri made soon after she started in her position as Plaintiff's direct supervisor

that Koehler intended to terminate Plaintiff and Koehler's statement, also around this time, that she wanted to delay Plaintiff's special evaluation. Plaintiff discusses this record evidence, without focusing on the timing of the events, which is critical to establish the causal aspect of a retaliation claim, that is, that there is some relation between the protective activity and the adverse action. In other words, the adverse action must be <u>related</u> to the protective activity. And Amiri admitted that she had no knowledge about the DEO's investigation of Larkin's conduct toward Fayson because she did not start her position as Plaintiff's direct supervisor until January 11, 2008. Also, Koehler's statements to Amiri about Plaintiff, which occurred, at the earliest, on January 11, 2008, when Amiri started her position, are too far in time from Plaintiff's March 30, 2007 interview, without some other evidence, to establish a causal relation.

Accordingly, Plaintiff cannot establish a *prima facie* case of retaliation based on his March 30, 2007 interview by the DEO.

### B. The March 25, 2008 Interview

Defendant assumes, for the sake of argument, that Plaintiff's March 25, 2008 interview in connection with Fayson's second DEO complaint, this time against Koehler, was protective activity. And Defendant assumes that the non-reappointment of Plaintiff was an adverse action. Defendant argues, however, that the record is bereft of any genuine issues of material fact with respect to any causal relationship between the March 25, 2008 interview and the non-reappointment. The Court agrees.

It is undisputed in the record that there is a close proximity between Plaintiff's March 25, 2008 interview and Plaintiff's non-reappointment, which Koehler prepared on March 27, 2008. However, "temporal proximity alone is insufficient to create a genuine issue of material fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Watkins v. Secretary Dept. of Homeland Sec.*, 2010 WL 4263186, at *5 (11th Cir. Oct. 27, 2010); *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010).

Here, the record is undisputed that Koehler was not aware that Plaintiff was a witness in the investigation of Fayson's retaliation complaint until April 8, 2008, when she saw the final report of the investigation. This was <u>after</u> Koehler had already decided to recommend that Plaintiff not be reappointed. In fact, Koehler had already begun preparing the text for the non-reappointment recommendation as early as March 27, 2008.[5] Thus, it is impossible for Plaintiff to demonstrate a causal relation between his interview as part of Fayson's retaliation complaint and his non-reappointment.

Plaintiff continually misstates the record on this issue. Plaintiff contends that the record reflects that Koehler was aware of Plaintiff's March 25, 2008 interview. Plaintiff is incorrect. Although the record reflects that at times during the duration of the Fayson complaint against Koehler, which lasted from roughly November 2007 until April 8, 2008, Koehler requested information regarding the investigation of Fayson's complaint against her,

---

[5] As Defendant notes in its motion, the Eleventh Circuit has been clear that a causal connection cannot be established where the decision maker has already started the process for taking adverse action prior to gaining knowledge of the protected activity.

there is absolutely no record evidence that Koehler was informed at any time that Plaintiff was a witness in the investigation. Indeed, Koehler stated that she never discovered the identities of Fayson's witnesses in his DEO complaint until she received the Final Investigative Report on April 8, 2008.

Further, although Koehler instituted the in/out board to keep track of her employees, there is no evidence in the record suggesting that Plaintiff indicated on the board that he was being interviewed by the DEO on March 25, 2008. Again, Plaintiff misstates the evidence and assumes Koehler was aware of Plaintiff's March 25, 2008 interview because the day before she inquired about his whereabouts with Wisgerhof after he left the office at approximately 3:50 and indicated on the in/out board that he was on "break" and did not return until 5:05.

Even Plaintiff testified during his deposition that he assumed Koehler learned of the investigation and his participation on April 8, 2008, when she received the final report. And Plaintiff testified that he did not have any information to suggest that Koehler received information about the investigation before the final report was issued.

The record reflects that Bill Havens of the DEO testified that Koehler did not receive any information with respect to witnesses and that the independent investigator, Mr. Ginnetti, would not have provided Koehler with that information. Havens also testified that Koehler did not have access to any documents during the investigation.

Finally, Plaintiff's heavy reliance on Amiri's testimony does not establish a causal relationship because her testimony relates to incidents that occurred <u>before</u> Plaintiff's March

25, 2008 protective activity.  Again, it is axiomatic that Koehler could not have retaliated against Plaintiff based on protective activity that had not yet occurred.

Accordingly, Plaintiff cannot establish a *prima facie* case of retaliation based on his March 25, 2008 interview by the DEO.

### III. Plaintiff Cannot Establish that Koehler's Legitimate Non-Retaliatory Rationale for Recommending Plaintiff's Non-Reappointment Was Pretextual

Even if the Court assumes, for the sake of argument, that Plaintiff can establish a *prima facie* case of retaliation, the record reflects that Koehler had a legitimate and non-retaliatory basis for not re-appointing Plaintiff to his position; ultimately, Koehler concluded during the course of the reorganization at the Office of Admissions that Plaintiff was not a good fit for his position or the office as a whole.  And Plaintiff has not established pretext.

The record reflects extensive issues with Plaintiff's performance, which were predominantly raised by people other than Koehler.

Wisgerhof testified that she and Koehler discussed Koehler's goals for the office and Plaintiff's lack of ability to perform the kind of work she wanted, which is why they decided to non-reappoint Plaintiff.  Wisgerhof testified that this conversation took place before Koehler drafted the March 27, 2008 non-reappointment recommendation.

Bognar testified that he and Koehler discussed Koehler's desire to non-reappoint Plaintiff based on Plaintiff not being a good fit in the position probably weeks before March 27, 2008 (although he could not state an exact date as to how much time prior to March 27, 2008 their conversations occurred), and Bognar supported Koehler's decision.

Plaintiff testified that he had "no idea" why Koehler would retaliate against him prior to April 8, 2008, the point at which she first learned that he was a witness in Fayson's complaint against her.

Amiri admitted that there were issues with Plaintiff's performance, but she did not agree with how Koehler was addressing them and thought that Plaintiff deserved a chance to improve. Amiri also admitted that all of her emails about Plaintiff's performance were truthful. And Amiri testified that, although she disagreed with Koehler's decision, she was not involved in the decision to non-reappoint Plaintiff.

Finally, on the issue of pretext, it is irrelevant whether Plaintiff disagreed with Koehler's reasons or felt that he was qualified for the position. Plaintiff's own evaluations and opinions about Koehler's decision are insufficient to establish pretext. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332-33 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

Accordingly, Plaintiff cannot show that Koehler's legitimate, non-retaliatory rationale for recommending Plaintiff's non-reappointment was pretextual for unlawful retaliation.

It is therefore ORDERED AND ADJUDGED that:

1. Defendant University of South Florida Board of Trustees' Motion for Summary Judgment (Dkt. 16) is GRANTED.

2. The CLERK is directed to enter final judgment in favor of Defendant University of South Florida Board of Trustees and against Plaintiff John Schoppman.

3. The CLERK is directed to close this case.

**DONE** and **ORDERED** in Tampa, Florida on May 23, 2012.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2011\11-cv-216.msj16.frm